**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

RYAN MARSELIS, Individually and on Behalf of All Others Similarly Situated,

                Plaintiff,

    v.

FOX FACTORY HOLDING CORP., MICHAEL C. DENNISON, DENNIS C. SCHEMM, BRENDAN R. ENICK, MAGGIE E. TORRES, and SCOTT R. HUMPHREY,

                Defendants.

Civil Case No. 1:24-cv-00747-TWT

<u>CLASS ACTION</u>

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO <u>DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..............................................................................1

STATEMENT OF FACTS ..................................................................................3

ARGUMENT .....................................................................................................6

    A. The AC Adequately Alleges Falsity.................................................6

    1.    Defendants' Materially False and Misleading Statements ........................7

    2.    The Alleged Misstatements Are Not Puffery ...........................................13

    3.    The Safe Harbor Does Not Apply ...........................................................15

    4.    The AC Pleads Falsity With the Requisite Particularity ...........................17

    B. The AC Adequately Alleges Scienter Under *Tellabs*' Holistic Analysis .......17

    1.    The AC Pleads Contemporaneous Facts Contradicting Defendants' Statements to Investors..............................................................................18

    2.    Other Factors Contribute to the Strong Inference of Scienter...................22

    C. The AC Adequately Alleges Loss Causation.................................................24

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................24

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ........................................................................16

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...........................................................................................24

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)...........................................14, 15, 18, 24

*In re Flowers Foods, Inc. Sec. Litig.*,
No. 7:16-CV-222, 2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ...............16, 23

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ........................................................................17

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015)............................................................................14

*In re Health Ins. Innovations Sec. Litig.*,
No. 8:17-2186, 2019 WL 3940842 (M.D. Fla. June 28, 2019).........................23

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010).............................................................25

*Luczak v. Nat'l Beverage Corp.*,
812 F. App'x 915 (11th Cir. 2020)......................................................6, 7, 12, 19

*Marrari v. Med. Staffing Network Holdings, Inc.*,
395 F. Supp. 2d 1169 (S.D. Fla. 2005).............................................................11

*Metropolitan Transit Auth. Defined Pension Benefit Master Tr. v.*
*Welbilt, Inc.*,
No. 8:18-3007, 2020 WL 905591 (M.D. Fla. Feb. 6, 2020) .........................3, 24

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ..............................................................21

*Mogensen v. Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014)....................................................21

*Monroe Cnty. Emp. Ret. Sys. v. S. Co.*,
  333 F. Supp. 3d 1315 (N.D. Ga. 2018)....................................................21

*Neb. Inv. Council v. Fidelity Nat'l Info. Servs., Inc.*,
  No. 3:23-cv-252, 2024 WL 4349125 (S.D. Fla. 2024)..............................*passim*

*Patel v. Patel*,
  761 F. Supp. 2d 1375 (N.D. Ga. 2011)....................................................25

*In re Peritus Software Servs., Inc.*,
  52 F. Supp. 2d 211 (D. Mass. 1999)........................................................15

*Ret. Sys. v. Nat'l Vision Holdings*,
  No. 1:23-cv-00425, 2024 WL 1376016 (N.D. Ga. Mar. 30, 2024)....................11

*Ret. Sys. v. Synovus Fin. Corp.*,
  No. 1:09-cv-01811, 2011 WL 13130185 (N.D. Ga. May 19, 2011)..................17

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016)....................................................22

*S.E.C. v. Merch. Cap., LLC*,
  483 F.3d 747 (11th Cir. 2007) ................................................................16

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002)............................................2, 12, 15

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................18, 22

*In re Theragenics Corp. Sec. Litig.*,
  137 F. Supp. 2d 1339 (N.D. Ga. 2001)..................................................*passim*

*Tolbert v. Queens Coll.*,
  242 F.3d 58 (2d Cir. 2001) ....................................................................13

iii

*Tung v. Dycom Indus., Inc.*,
    454 F. Supp. 3d 1244 (S.D. Fla. 2020) ........................................................14, 16

*In re Urb. Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ....................................................12, 14, 20

*Urvan v. TVP Ventures, LLC*,
    No. 1:20-cv-153, 2021 WL 8648896 (N.D. Ga. Mar. 25, 2021)........................11

*Waterford Twp. Gen. Emp. Ret. Sys. v. Suntrust Banks, Inc.*,
    No. 1:09-CV-617, 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010)......................25

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023)...............................................................21

## Rules and Statutes

Federal Rules of Civil Procedure

Fed. R. Civ. P. 8(a)(2)........................................................................................24

Fed. R. Civ. P. 9(b) .............................................................................................6

Fed. R. Civ. P. 10b-5 ......................................................................................1, 6

Securities Exchange Act of 1934

Exchange Act §10(b) .......................................................................................1, 25

Exchange Act §20(a) .......................................................................................1, 25

United States Code

15 U.S.C. §78u-4(b)(1)(B)..................................................................................6

## PRELIMINARY STATEMENT

This is a securities class action on behalf of all purchasers of Fox Factory Holding Corp. ("FF") common stock between May 6, 2021 and November 2, 2023, inclusive (the "Class Period"). Lead Plaintiff Ryan Marselis ("Plaintiff") asserts securities fraud claims pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against FF, its Chief Executive Officer ("CEO") Michael C. Dennison ("Dennison") and the three individuals who served as FF's Chief Financial Officer ("CFO") during the Class Period – Scott R. Humphrey ("Humphrey"), Maggie E. Torres ("Torres"), and Dennis C. Schemm ("Schemm").

FF engineers and sells high-performance suspension products for bicycles and specialty vehicles. Prior to the Class Period, FF's revenue soared in response to a burst in consumer demand for its products following the onset of the COVID-19 pandemic. By the start of the Class Period, however, consumer demand for bicycles (and the parts to make them) was cratering and by October 2021 had returned to pre-pandemic levels. As a result, FF's customers began canceling orders or requesting that they be delayed. Unwilling to jeopardize its relationships with its customers, FF agreed, leaving it holding substantial excess inventory of both raw materials and finished goods, which significantly lowered demand in 2022 and 2023 as the excess inventory from the earlier canceled and/or delayed orders was cleared. Nevertheless,

1

throughout the Class Period, Defendants consistently characterized demand for FF's products in glowing terms including "unprecedented," "incredibly strong," and "showing no signs of abating." In addition, Defendants assured investors that "overestimating" demand was not "a big concern" because FF had "its finger on the pulse of the market" and was in "close[] proximity" to its customers and understood their "sell through" and "inventory levels." When the truth was revealed on November 2, 2023, with FF's after-hours disclosure of declining demand and sales, its stock price declined $22.60, or 37.34%, the following day to close at $60.53.

Defendants' arguments that Plaintiff has failed to plead falsity, scienter and loss causation are meritless. The Amended Complaint (the "AC"), ECF No. 35, alleges false and misleading statements with the requisite particularity by alleging facts contradicting Defendants' statements touting the strength of demand for FF's products and the stated reasons for its rising inventories and reported results. *See*, *e.g.*, *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1363-65 (N.D. Ga. 2002). Also, at a minimum, these allegations support a strong inference of "severe recklessness." *In re Theragenics Corp. Sec. Litig.*, 137 F. Supp. 2d 1339, 13449 (N.D. Ga. 2001) (Thrash, J.). If the witness accounts supporting the AC's allegations of falsity are true, Defendants' failure to disclose that the pandemic surge in demand had abated and that future demand would be reduced as the industry and FF worked through excess inventory "was, at the least, sufficiently lacking in prudence or

2

caution as to constitute severe recklessness." *Id*. at 1348-49. Finally, the AC adequately alleges loss causation. There is no support for Defendants' contention that at the pleading stage, Plaintiff is required to apportion the decline in FF's stock price among all the events FF chose to include in the November 2, 2023, corrective disclosure. Not only is it impossible for Plaintiff to do so at the pleading stage, "[i]f the Court were to accept Defendants' position, companies could insulate themselves from securities fraud claims by timing the release of [corrective] disclosures . . . to coincide with [other] negative [news], thus preventing a plaintiff from ever alleging loss causation." *Metropolitan Transit Auth. Defined Pension Benefit Master Tr. v. Welbilt, Inc.*, No. 8:18-3007, 2020 WL 905591, at *7 & n.5 (M.D. Fla. Feb. 6, 2020). For these reasons, and those stated herein, Defendants' motion to dismiss must be denied.

## STATEMENT OF FACTS

FF's Specialty Sports Group ("SSG") and Power Vehicle Group ("PVG") engineer, manufacture and market high-performance suspension products for bikes (SSG) and off-road and other specialty vehicles (PVG). ¶20.[1] FF's products are marketed to leading original equipment manufacturers (OEMs) and distributed to consumers through a global network of dealers and distributors (the "aftermarket"), with OEMs contributing 75%-80% of FF's total revenues. ¶21.

---

[1] All "¶" cites are to the AC.

3

Demand for bicycles exploded during the 2020 pandemic year due to a surge in popularity of outdoor activities.  ¶25.  As bike inventories quickly sold out, bike OEMs, which accounted for 75-80% of SSG's revenue, began ordering significantly more product than usual from FF and other parts manufacturers to meet the increase in consumer demand and navigate supply chain shortages.  ¶26.  This outsized demand quickly evaporated, however, and from March through September of 2021, OEMs began canceling the large orders they had placed with bike fabricators and approaching Fox and other suppliers about delaying shipments of the components they had ordered.  ¶¶27, 30.   This left FF holding substantial purchase orders for bike shocks, forks and suspensions that the OEMs no longer needed.  ¶27.  To maintain its relationships with the OEMs, FF agreed to delay delivery of these orders rather than have them cancelled and to warehouse any completed parts until they were needed by the OEMs.  ¶¶28-30.  As a result, beginning in Q1 2021, FF's inventories of raw materials and completed parts began to rise significantly from $127 million in Q42020 to a high of $379.8 million in Q12023, and FF began reporting substantial "remaining performance obligations" ("RPOs") under its contracts – performance obligations not to be completed within a year – on a quarterly basis.  ¶¶27, 41-45.  Significantly, prior to Q1 2021, FF had never before reported RPOs, indicating that FF had historically completed its contracts within a year.  ¶¶43-44.  However, in each of the first three quarters of fiscal 2021 when

4

OEMs and FF were negotiating agreements to delay orders, FF disclosed substantial RPOs of $30.3 million, $10 million, and $191.2 million, respectively. ¶¶44-45.

FF's agreements with OEMs in 2021 to delay fulfillment of existing orders due to plummeting demand for bikes led to lower OEM demand in 2022 and 2023 as products shipped in 2021 were largely the fulfillment of earlier delayed orders. ¶31. A former senior manager of demand planning and forecasting who worked at FF from July 2018 to November 2023 estimated that in 2022, OEM demand declined by 40% and that demand from Specialized Bicycle Components ("Specialized"), one of FF's largest OEM customers, fell an estimated 60%. *Id.*

This same pattern played out with SSG's aftermarket bike customers as well. In 2021, dealers and distributors who had over-ordered to meet the pandemic-fueled demand of 2020 also began canceling or reducing orders with FF and aftermarket inventory began to build. ¶¶4, 35, 38-40. Indeed, by the summer of 2022, there was so little demand and so much product had arrived at FF's Reno and Vancouver warehouses from FF's Taiwan manufacturing facility that additional offsite storage locations had to be rented. ¶¶36, 40.

PVG was affected by the same market conditions as SSG. By 2022, the surge in demand from COVID was over, PVG had lost two large OEM customers, Jeep and Polaris, and rising inventories required more rented warehouse space. ¶¶47, 54, 57. Nevertheless, due to SSG's poor performance, in 2022, PVG's Aftermarket

5

Applications Group (AAG) was tasked with making up an estimated shortfall of $100 million in the forecast. ¶¶47-48. During this time, as Defendant Humphrey was aware, PVG was inflating its reported revenue by shipping aftermarket orders at quarter-end before the agreed-upon shipping date only to have them returned by the customers. ¶¶49-52, 55.

The truth was revealed on November 2, 2023, when FF announced disappointing results for Q32023 fueled by a year-over-year 58.6% decline in SSG sales and sharply lower sales growth in PVG due to "slower buying patterns" from OEMs and a drop in consumer demand. ¶¶145-46. In addition, FF cut its sales guidance for FY2023. ¶145. In response, FF's stock price plummeted. ¶148.

**ARGUMENT**

### A.    The AC Adequately Alleges Falsity

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b), a securities complaint alleging that the defendants made false or misleading statements must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" 15 U.S.C. §78u-4(b)(1)(B). "Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 923 (11th Cir. 2020). "A statement is

6

misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *Id*. Here, the AC adequately alleges that Defendants made material misstatements and omissions regarding demand for FF's products, FF's rising inventories, and the drivers of its reported revenue.

### 1. Defendants' Materially False and Misleading Statements

Throughout the Class Period, Defendants consistently characterized existing and projected demand for SSG and PVG products in both the OEM and aftermarkets in positive terms – "strong," "high," "robust," "very strong," "incredibly strong," "staggering" and "unprecedented" – and credited this strong demand with driving FF's reported growth. *E.g.*, ¶¶61, 63-64, 69, 71, 78, 80-84, 89-90, 92, 94, 100, 102, 106-07, 109, 114-15, 117, 123. In addition, Defendants repeatedly assured investors that there were "no signs" that demand was "abating," being "overestimated," or slack[ing] off at all in any of [FF's] product lines" and made statements that reassured investors that Defendants' stated assessment of the market was reliable, including that FF kept "a finger on the pulse of demand" and was in "clos[e] proximity" to its OEM customers and understood "what[] their business looks like and what they're doing in terms of current inventory." *E.g.*, ¶¶71-72, 81, 84-85, 94, 103, 126, 135. Based on their purported knowledge of the market, Defendants advised investors that "[w]ith the current pace of industry demand, [FF] believe[d]

it [would] . . . take 8 to 10 months to [meet the] current customer demand level and another 12-18 months to [replenish] depleted inventory channels," characterizing channel inventory levels as "close to historic lows" and distribution centers as "empty" because whatever product FF was able to build was "sell[ing] all the way through the channel to the end consumer." *E.g.*, ¶¶62-63, 71, 82-83, 85, 94. In view of the foregoing, Defendants boasted that conditions were such that FF was "on track" to reach and "tracking right to" its long-term projection of $2 billion in revenue by 2025 characterizing the goal as "absolutely" achievable and stating that Defendants were "confident" and "fe[lt] pretty damn good about it" and had begun "to set [their] sights on even more ambitious goals." *E.g.*, ¶¶75, 103, 110, 119, 126-27. Indeed, Defendants went so far as to suggest that "the tectonic shift created in consumer demand" by the pandemic might be permanent, stating that it "seemed more than just a transitory bubble," and FF's risk warnings characterized a decline in demand from COVID-level highs as only a mere "possibility." *E.g.*, ¶¶61, 66, 70-71, 74, 79, 81, 91. Although inventory was rising steadily throughout the Class Period, Defendants attributed the increase to "additional raw materials purchases to mitigate risk associated with [the] supply chain" and "receipt of long lead time items that had been delayed, higher levels of safety stock to mitigate uncertainty, and natural growth to meet anticipated demand" rather than declining demand. *E.g.*,

8

¶¶71, 78, 90, 100, 114-15, 123.[2]  Even when FF gradually began to report lower growth in revenue and a decline in SSG sales beginning in February 2023, Defendants identified "a return to seasonality" as the "primary" cause and stated that Defendants "believe[d] end customer demand . . . continue[d] to be generally positive" and that "demand was more positive than people give it credit for," boasting that demand was "strong" and "hasn't been the problem."  ¶¶126-27, 131-32, 135, 142.

In fact, however, the rosy picture painted by Defendants was untrue.  As detailed in highly corroborative accounts from multiple former employees of FF including FF's VP of Supply Chain, and from the COO of Specialized, SSG's largest OEM customer, by the start of the Class Period, the pandemic era explosion in demand was over.  Specialized's COO explained that demand for bikes had begun to moderate by May 2021 and had fallen back to pre-pandemic (2019) levels by October 2021, which caused OEMs, including Specialized, to cancel or delay orders for parts that they had placed with FF and other suppliers, leaving the suppliers holding large inventories of raw materials and finished goods.  ¶¶26-28.  This

---

[2]    Defendants misstate Plaintiff's theory of falsity with respect to Defendants' inventory statements.  *See* ECF No. 46-1 at 10-11.  The AC alleges these statements were materially false and misleading because they misled investors regarding ***the reasons inventory was increasing***.  *E.g.*, ¶¶27-28, 35-36, 40.

account was corroborated by FE 1, a manager of demand planning and forecasting at FF from July 2018 through November 2023, who reported to VP of Supply Chain, Mark Garcia.[3]  FE 1 stated that "a lot" of SSG's OEM customers approached FF in the first half of 2021 about delaying shipments of the parts they had ordered from FF.  ¶¶29-30.  According to FE 1, these requests to delay orders were frequently extended and sometimes led to outright cancellations of orders in late 2021 and 2022. *Id*.  FE 1 identified Christopher J. Tutton ("Tutton"), SSG's President who reported directly to Defendant Dennison, as one of two senior executives involved in approving order cancellations and who attended monthly sales and operations ("SO&P") meetings at which forecasts reflecting slowing OEM demand and resulting inventory build-up were reviewed and discussed.  ¶29.  Further, FE 1 stated that weekly reports with respect to these issues prepared by Sydney Wu, VP International & Controller, who reported to Defendant Humphrey, were provided to FE 1's forecasting team.  *Id.*

FE 2, a Customer Service/Call Center Manager for SSG's aftermarket division from 2018 to April 2023 who reported to Steve Watkins, Director of Global Aftermarket Bike Fulfillment and Domestic Sales and Services who, in turn, reported to SSG President Tutton, recounted that declining demand and inventory

---

[3]    Garcia stated that by Q2-2022, FF was proactively approaching customers on its own to cancel what FF believed were excessive order.  ¶32.

build-up also afflicted the smaller, aftermarket side of SSG's business. ¶¶37-40. For example, FE 2 learned directly from Watkins that Quality Bicycle Products, the largest bike distributor in the U.S., had canceled a multi-million-dollar order with FF in the first half of 2021. ¶¶37, 39.

FE 3, VP of Sales for PVG's aftermarket segment who oversaw a group of approximately 50 salespeople, reported that by mid-2022, PVG was affected by the same market conditions as SSG but was nevertheless being tasked with making up a forecast shortfall of approximately $100 million resulting from SSG's poor performance. ¶¶46-48. FE 4 and FE 5, cost accountants at PVG's Gainesville facility, reported that during this period, PVG was pulling forward revenue at quarter ends by shipping product early in advance of agreed shipment dates only to have it later returned by the customers. ¶¶49-55. Importantly, the foregoing witness accounts of declining demand across FF's businesses are not only consistent with each other, as noted above, they are also corroborated by FF's financial disclosures during the relevant period with respect to RPOs and inventories.

The foregoing allegations directly contradicting the alleged misstatements detailed above are more than sufficient to allege falsity.[4]  *See Marrari v. Med.*

---

[4]     *City of Southfield Gen. Emps.' Ret. Sys. v. Nat'l Vision Holdings*, No. 1:23-cv-00425, 2024 WL 1376016 (N.D. Ga. Mar. 30, 2024), and *Urvan v. TVP Ventures, LLC,* No. 1:20-cv-153, 2021 WL 8648896 (N.D. Ga. Mar. 25, 2021) are distinguishable on this basis.

*Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1185 (S.D. Fla. 2005) (falsity of statements that "demand . . . remains robust" and that "record results" reflected "significant growth" were adequately pleaded where complaint alleged that "demand was falling" and new offices were underperforming); *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 648 (E.D. Pa. 2015) ("[A] Complaint which alleges the defendant CEO in a securities fraud case misrepresented to investors that the demand for his company's products was 'solid,' 'strong,' and 'good' when the actual condition of sales was 'disappointing' and had 'declined,' is sufficiently particularized to satisfy PSLRA requirements."). In this Circuit, witness accounts such as those in the AC are adequate to allege falsity when "the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Luczak*, 812 Fed. Appx. at 924; *see also Neb. Inv. Council v. Fidelity Nat'l Info. Servs., Inc.*, No. 3:23-cv-252, 2024 WL 4349125, at *4 & n.8 (S.D. Fla. 2024) (witness accounts reliable and adequate to allege falsity when they "worked directly on matters they described"); *Sci.-Atlanta*, 239 F. Supp. 2d at 1364 (false statements regarding demand for company's products alleged with particularity where complaint "highlight[ed] statements about increasing demand that allegedly were false and [gave] reasons why the statements were false at the time they were made" based on accounts of former employees); *Theragenics*, 137 F.

12

Supp. 2d at 1346-47 (falsity adequately alleged based on, *inter alia*, accounts of "numerous medical doctors" and communications with former employees of defendant's competitor).  Here, there is no question that the witnesses cited in the AC were well-positioned to observe the rise and fall in demand for FF's products during the Class Period and the impact on FF's business.  Tellingly, Defendants' motion fails to address these accounts in any meaningful way and ignores entirely the accounts of FF's VP of Supply Chain and Specialized's COO.  *See* §A.1, *infra*.[5]

## 2.    The Alleged Misstatements Are Not Puffery

Defendants' statements characterizing the demand for FF's products in positive terms are ***not*** immaterial puffery.[6]  *See* ECF No. 46-1 at 13-14.  Numerous courts have held that statements similar to those challenged in this case falsely characterizing a core business operation as "strong" when it is not are material to

---

[5]    Defendants' argument (ECF No. 46-1 at 9-10) that Plaintiff's theory of falsity fails because revenue "went up" and "the guidance was right" is meritless.  FF's reported revenue during the Class Period was attributable, in part, to the fulfillment of earlier orders that FF agreed to delay in lieu of cancellation, not strong demand.  ¶31.  Also, Defendants' argument entirely ignores that PVG's revenue was inflated by pulling forward revenue at quarter ends.  ¶¶49-55.

[6]    Defendants' puffery argument is improperly vague.  Defendants identify only four specific statements as puffery while claiming in a footnote that 25 enumerated paragraphs of the AC contain additional unspecified statements that qualify as such.  *See* ECF No. 46-1 at 14 & n. 4.  This approach does not provide Plaintiff with sufficient information to formulate a complete response to Defendants' argument as the cited paragraphs contain multiple alleged misstatements.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).

investors. *See*, *e.g.*, *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109-10 (D.C. Cir. 2015) (statement that sales of aftermarket products were "very strong" during the fiscal year was not immaterial puffery); *Neb. Inv. Council*, 2024 WL 4349125, at *4 (statement describing "strong cross-selling performance" not puffery); *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020) (statement that backlog calculations reflected "strong performance" not puffery); *Urb. Outfitters*, 103 F. Supp. 3d at 650-51 (statements that demand for company's products was "solid," "strong," and "good" when actual condition of sales was "disappointing" and "declining" were not puffery because they provide "concrete information" about performance). As this Court has instructed, "[a]n alleged misstatement or omission must be 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance' to be deemed inactionable puffery." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (Thrash, J.) (internal citation omitted). That is plainly not the case here. In fact, whether the pandemic surge in demand for FF's suspension products was sustainable or abating was ***the issue*** of interest to analysts and investors during the Class Period. It was the focus of every FF earnings call during this period. *E.g.*, ¶¶61-64, 71-72, 80-85, 92-96, 102-03, 109-10, 117-19, 126-27, 134-35, 142.

As this Court has instructed, context matters in determining whether alleged misstatements are puffery. *Equifax*, 357 F. Supp. 3d at 1224. Here, as in *Equifax*,

14

the challenged statements were made repeatedly, and almost verbatim, over the course of the Class Period. *Id.* (fact that statements "were made repeatedly to assure investors . . . could lead a reasonable investor to rely upon them"). In addition, many were made in response to analyst inquiries further demonstrating their materiality. *See Neb. Inv. Council*, 2024 WL 4349125, at *4. Moreover, Defendants consistently cited "strong demand" as driving sales and assured investors that FF kept "a finger on the pulse of demand," and, due to FF's "close proximity" to its OEM customers' "sell-through," over-estimating demand was not "a significant issue." *E.g.*, ¶¶71-72, 81, 84-85, 94, 103, 126, 135. In this context, a reasonable investor would have relied upon Defendants' misstatements and omissions to conclude that demand for FF's products was strong and showed no signs of abating and that rising inventories were no cause for alarm. *See Sci.-America*, 239 F. Supp. 2d at 1360 (statements that demand was accelerating when it was falling "were not so exaggerated or vague that the Court can find as a matter of law that [they] were not material.").[7]

### 3.    The Safe Harbor Does Not Apply

Defendants challenge four of the alleged misstatements in the AC as "forward-looking" and argue that they are protected by the PSLRA's safe harbor. ECF No.

---

[7]    Defendants' out-of-Circuit authority is distinguishable. In *In re Peritus Software Servs., Inc.*, 52 F. Supp. 2d 211, 220 (D. Mass. 1999), the company's statement citing "unprecedented market demand" for its services generally in the context of launching a new service "was simply part and parcel of the standard corporate hyperbole that accompanies any new product or service announcement."

46-1 at 11-13.[8]   However, the identified statements are not entitled to safe harbor protection because Defendants knew they were false at the time they were made (*see* §I.A, *infra*) and they were not accompanied by meaningful cautionary language. "[M]eaningful cautionary language must be more than mere boilerplate language." *Tung*, 454 F. Supp. 3d at 1256.  It must be "specifically tailored" to the risks Plaintiff argues existed.  *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222, 2018 WL 1558558, at *11 (M.D. Ga. Mar. 23, 2018).  Here, the four statements Defendants identify as forward-looking were made during earnings calls that took place over a nearly two-year period and at which the identical boilerplate warning was read at the outset of the call.  This was plainly inadequate to invoke the protection of the safe harbor.  *See S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 768–69 (11th Cir. 2007) (holding that forward-looking statements were not accompanied by meaningful cautionary language because defendants continued to provide the same general risk disclosures).

---

[8]   As they did with respect to their puffery argument (*see supra* n.6), Defendants improperly include a footnote in this section of their brief asserting that 17 other paragraphs in the AC contain unspecified statements that fall within the safe harbor. Defendants' perfunctory approach is even more problematic in this context because forward-looking statements can contain present tense components that are not entitled to safe harbor protection. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1328 (11th Cir. 2019).  In fact, one of the four statements Defendants specifically identify as forward-looking is ***not*** entitled to safe harbor protection because it references "the ***current*** pace of industry demand." *See* ECF No. 46-1 at 12.

#### 4.      The AC Pleads Falsity With the Requisite Particularity

To comply with the PSLRA's particularity requirement, a securities plaintiff must specify the time, place, and content of the alleged misstatements, *i.e.*, "the who, what, when[,] where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006). The AC does this by reproducing Defendants' alleged false statements, identifying the speaker, specifying when and where those misstatements were made, and summarizing immediately below the facts and reasons the statements were false and misleading (*see generally* ¶¶58-144) which are set forth in detail in the prior section of the AC (*see generally* ¶¶25-57). Defendants' argument that the AC's allegations are "facially deficient" because they do not repeat *verbatim* all of the specific facts demonstrating falsity after each individual alleged misstatement (ECF No. 46-1 at 7-9) is meritless. *See City of Pompano Beach Gen. Emps.' Ret. Sys. v. Synovus Fin. Corp.*, No. 1:09-cv-01811, 2011 WL 13130185, at \*7 (N.D. Ga. May 19, 2011) (rejecting argument that pleading was deficient where plaintiffs highlighted alleged false statements and pled "at the conclusion of each time period how they believe[d] the statements made by Defendants were misleading").

### B.      The AC Adequately Alleges Scienter Under *Tellabs*' Holistic Analysis

Contrary to Defendants' contention, the AC adequately alleges scienter. A plaintiff meets the pleading requirement for scienter under the PSLRA by showing

a strong inference of "severe recklessness." *Theragenics*, 137 F. Supp. 2d at 1348. "Circumstantial evidence can be sufficient to establish a strong inference of scienter." *Equifax*, 357 F. Supp. 3d at 1232. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences' [internal citation omitted]." *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 324 (2007).[9]  "[T]he question is whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount." *Equifax*, 357 F. Supp. 3d at 1233 (internal quotations and citations omitted).

### 1. The AC Pleads Contemporaneous Facts Contradicting Defendants' Statements to Investors

Here, Plaintiff principally pleads scienter based on the following facts:  (i) the accounts of multiple former employees across FF's business segments, FF's VP of Supply Chain, and the COO of Specialized which report that by the start of the Class Period, demand was cratering, substantial numbers of orders were being delayed and/or canceled, and FF's inventories were rising to such a degree that additional storage space had to be rented to house the excess (¶¶26-57); (ii) the availability of

---

[9]    Significantly, Defendants offer no competing inference, let alone a plausible competing inference, that would explain the divergence between the uniform witness accounts of declining demand throughout the Class Period and Defendants' statements that demand was robust.

weekly reports reflecting slowing demand and rising inventories that were prepared by Sydney Wu, FF's VP International & Controller, who reported to Defendant Humphrey (¶29); (iii) monthly SO&P meetings attended by SSG President Tutton, a direct report of Defendant Dennison, at which issues with slowing demand and rising inventories were discussed (*id.*); (iv) Tutton's involvement in approving requests from FF's large OEM customers to delay and/or cancel orders due to the decline in consumer demand for bikes (¶30); (v) FF's own financial disclosures which reported rising inventories and staggering, never-before-seen RPOs, which coincided with the onset of negotiations between FF and its OEM customers in the first and second quarters of 2021 to delay orders (¶¶27, 41-45); and (vi) Defendant Humphrey's awareness of PVG's practice of pulling forward revenue at quarter ends (¶52). If these allegations are true, Defendants' failure to disclose that the pandemic surge in demand had abated and that future demand would be negatively impacted as the industry and FF worked through excess inventory "was, at the least, sufficiently lacking in prudence or caution as to constitute severe recklessness." *Theragenics*, 137 F. Supp. 2d at 1349; *see also Luczak*, 812 Fed. App'x at 925 (if confidential witness accounts that non-GAAP metrics were not used in operating company's business were true, "they would provide evidence of the defendants' recklessness or knowing falsity in saying that [company's] positive financial results were confirmed by [the metrics]").

19

Defendants' argument that the AC fails to allege scienter rests on three erroneous contentions. First, Defendants argue that Plaintiff has failed to allege falsity because the AC does not identify "a document, report or other specific piece of contemporaneous information that contradicted or rendered false any of the [challenged] statements." ECF No. 46-1 at 16. However, this argument ignores the sales forecasts that were reviewed at the monthly SO&P meetings attended by SSG President Tutton (Dennison's direct report) and the weekly sales and inventory reports prepared for and provided to FE 1's team by Sydney Wu (Humphrey's direct report). ¶29. The availability of these reports constitutes circumstantial evidence that Defendants were aware or were severely reckless in not being aware of the declining demand negatively impacting FF's business. *See Urb. Outfitters*, 103 F. Supp. 3d at 653-54 (allegation based on witness reports that company maintained a database accessible to employees that showed declining sales trends supported inference of scienter even though there was no allegation that defendants had accessed the database). In fact, Defendant Dennison's repeated assurances that Defendants kept "a finger on the pulse of demand" and that FF used its "close[] proximity" to its OEM customers to understand those customers' sell-through and inventory levels (*see* ¶¶71-72, 81, 84-85, 94, 103, 126, 135), "plausibly show that the individual defendants had access to and monitored data indicating [FF's] decline in customer demand." *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D.

20

Cal. 2023).  Thus, the AC adequately alleges that Defendants were, at a minimum, severely reckless.

Next, Defendants argue that the five FE accounts individually and collectively fail to create a strong inference of scienter because "four of the five [FEs] are not alleged to have ever interacted with any named defendant."  ECF No. 46-1 at 16. However, "first-hand interactions with a defendant" are not a prerequisite for credible witness accounts.[10]  *See Monroe Cnty. Emp. Ret. Sys. v. S. Co.*, 333 F. Supp. 3d 1315, 1323 (N.D. Ga. 2018) (holding that *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014), cited by Defendants, does not stand for the proposition that the scienter standard requires plaintiffs to plead first-hand interactions between confidential witnesses and defendants).  Witnesses simply must be in positions that give them access to relevant knowledge.  *Neb. Inv. Council*, 2024 WL 4349125 at *4.  Here, as detailed above (*see* §I.A., *supra*), the FEs and other witnesses whose accounts underpin the falsity and scienter allegations in the AC "worked directly on [the] matters they described."  *Id*. at n.8; *see also Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (accounts of two CWs who held positions that directly exposed them to data and consumer complaints about Fitbit

---

[10]    *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008), cited by Defendants, is not to the contrary.  In *Mizzaro*, the Eleventh Circuit held that "the lack of direct evidence connecting the defendants to the alleged fraud is not fatal, because plaintiffs may create a 'strong inference' of scienter by circumstantial evidence alone."  *Id*. at 1249.

and reported to a non-defendant C-suite executive "indicat[ed] scienter by Fitbit executives").

Finally, Defendants' criticisms of the FEs' accounts as "vague" and "non-specific" are equally specious.  *See* ECF No. 46-1 at 18.  Rather than confront the totality of the witness accounts, which are detailed in thirty-two paragraphs across thirteen pages of the AC, Defendants attack isolated statements from just three of those thirty-two paragraphs (*see* ECF No. 46-1 at 18) and ignore entirely the accounts of the COO of Specialized, one of SSG's largest OEM customers, and FF's VP of Supply Chain who supervised FE 1 (*see* ¶¶26-28, 29, 32).

### 2.    Other Factors Contribute to the Strong Inference of Scienter

Improperly viewing the allegations of the AC in isolation rather than holistically, *see Tellabs*, 551 U.S. at 326, Defendants argue that the core operations doctrine, Defendants' sales of their FF holdings, and FF's amendment of its credit agreement do not individually give rise to a strong inference of scienter.  While this may be true, each ***bolsters*** the strong inference of scienter arising from the former employee and witness accounts.

The core operations doctrine, which infers that facts critical to a business's core operations are known to a company's key officers such as the Individual Defendants here, clearly bolsters the strong inference of scienter in this case given investors' focus on whether demand remained strong or was declining during the

Class Period. *See Flowers*, 2018 WL 1558558, at *14 ("Court can reasonably conclude that [COO] necessarily is provided significant information, formally and informally, about the financial performance, or failure of performance, over which he has overall operational responsibility").

Substantial sales of FF stock by insiders also bolster the inference of scienter here. *See* App. A and Exs. 1-20 to the Evangelista Declaration. Contrary to Defendants' contention, the AC does contain allegations showing that Defendants Dennison and Humphrey along with SSG President Tutton sold unusual amounts of their personal holdings of FF stock during the Class Period compared to prior periods. ¶¶152-55. *See In re Health Ins. Innovations Sec. Litig.*, No. 8:17-2186, 2019 WL 3940842, at *26–27 (M.D. Fla. June 28, 2019) (stock sales during the class period were "unusual" and "suspicious" where defendant made three sales, two of which represented between 10-20% of his holdings). Defendants argue that the AC's allegations are not specific enough because Plaintiff has not pled the specific dates of Dennison and Humphrey's sales. ECF No. 46-1 at 21. However, this Court may take judicial notice of those dates because they are reflected in Defendants' Form 4 filings with the SEC, attached as Exs. 1-20 to the Evangelista Declaration. *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582–83 (S.D.N.Y. 2011) (taking judicial notice of information in SEC Form 4s filed under penalty of perjury to determine whether stock sales are unusual or suspicious).

23

### C.    The AC Adequately Alleges Loss Causation

To allege loss causation, "Plaintiff must allege facts demonstrating that the Defendants' misrepresentations caused the losses for which the Plaintiff seeks to recover." *Equifax*, 357 F. Supp. 3d at 1247.  The "pleading rules [for loss causation] are not meant to impose a great burden upon a plaintiff."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  A plaintiff need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that "provide[s] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. at 346-47.  Here, the AC adequately alleges loss causation by alleging that throughout the Class Period, Defendants misrepresented demand for SSG and PVG products and FF's stock price declined when the omitted drop in demand was finally revealed on November 2, 2023.  *See Equifax*, 357 F. Supp. 3d at 1249-50.  Plaintiff is not required to disaggregate other potential causes for the drop in FF's stock price on the date of the corrective disclosure.  *See Metropolitan Transit Auth.*, 2020 WL 905591, at *7 (rejecting argument that plaintiff should have disaggregated other potential causes of loss).  This is not a case like those cited by Defendants in which "plaintiff's loss coincide[d] with *a marketwide phenomenon causing comparable losses to other investors*" and the complaint did not "adequately [plead] facts which if proven would show that [the plaintiff's] loss was caused by the alleged misstatements as opposed to intervening events." *In re HomeBanc Corp. Sec. Litig.*,

24

706 F. Supp. 2d 1336, 1361-62 (N.D. Ga. 2010) (internal quotations and citation omitted); *see also Waterford Twp. Gen. Emp. Ret. Sys. v. Suntrust Banks, Inc.*, No. 1:09-CV-617, 2010 WL 3368922, at *5-6 (N.D. Ga. Aug. 19, 2010) (alleged corrective disclosure coincided with the 2008 financial crisis which caused stock prices of other banks to experience substantially identical percentage declines on the same day as the alleged corrective event); *Patel v. Patel*, 761 F. Supp. 2d 1375, 1381 (N.D. Ga. 2011) ("[P]laintiffs have not offered any facts distinguishing between losses caused by the defendants' alleged misrepresentations and the intervening events that wreaked havoc on the banking industry as a whole.").[11]

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be denied. However, in the event that the Court grants, in whole or in part, the motion to dismiss, Plaintiff requests leave to amend. *See Theragenics*, 105 F. Supp. 2d at 1362–63 (permitting second amended complaint and citing Eleventh Circuit "presumption that leave to amend should be granted at least once when a more adequately pled complaint might state a cause of action").

---

[11] Because Plaintiff has adequately alleged a violation of §10(b) of the Securities Exchange Act, Defendants' motion to dismiss Plaintiff's claim under §20(a) of the Exchange Act must be denied.

DATED: December 13, 2024          Respectfully submitted,

 /s/ *James Evangelista*
James Evangelista (GA Bar No. 707807)
**EVANGELISTA WORLEY, LLC**
10 Glenlake Parkway
South Tower Suite 130
Atlanta, GA 30328
Telephone: 404-596-7334

*Liaison Counsel for Lead Plaintiff and the Class*

Deborah Clark-Weintraub (*pro hac vice*)
Thomas L. Laughlin, IV (*pro hac vice*)
Susan Hu (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile: 212-233-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
shu@scott-scott.com

Brian J. Schall
Andrew Brown
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 310-388-0192
brian@schallfirm.com
andrew@schallfirm.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

26

# LOCAL RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1(B).

/s/ *James M. Evangelista*
James M. Evangelista (GA Bar No. 707807)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of December 2024, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, and a copy of the foregoing pleading has been electronically mailed to all attorneys of record.

/s/ *James M. Evangelista*
James M. Evangelista (GA Bar No. 707807)

28