UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| RYAN MARSELIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FOX FACTORY HOLDING CORP., MICHAEL C. DENNISON, SCOTT R. HUMPHREY, MAGGIE E. TORRES, DENNIS C. SCHEMM,<br><br>Defendants. | Case No. 1:24-cv-00747-TWT<br><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

STATEMENT OF RELEVANT FACTS ................................................................3

LEGAL STANDARD..........................................................................................5

ARGUMENT ......................................................................................................6

I. THE SAC REMEDIES THE FAC'S DEFECT ....................................................6

II. THE SAC PLEADS ACTIONABLE STATEMENTS UNDER §10(b) ...........6

A. The Statements Concerning SSG and PVG Demand Were Materially False and Misleading .......................................................................................7

B. The Statements Concerning Inventory Were Materially False and Misleading ....................................................................................................11

C. The Revenue Guidance Was Materially False and Misleading..................12

D. The "Risk Disclosures" Were Materially False and Misleading ...............13

E. Defendants' False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor, Opinion, or "Puffery" ..............................................13

III. THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER WITH PARTICULARITY ..........................................................................................15

A. Allegations of Former Employees Are Well-Pled and Support a Strong Inference of Scienter ....................................................................................17

B. Defendants' Own Statements Corroborate the Witnesses and Admit Scienter 20

C. Defendants Profited Handsomely from Their Fraud ...............................22

IV. The SAC Adequately Pleads Loss Causation .................................................24

V. The SAC Adequately Pleads a 20(a) Claim .....................................................25

## Table of Authorities

**Page(s)**

**Cases**

*In re AFC Enters., Inc. Secs. Litig.*,
348 F.Supp.2d 1363 (N.D. Ga. 2004) (Thrash, J.) ..............................................24

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir 1999) ...................................................................15, 16

*Cambridge Ret. Sys. v. MEDNAX, Inc.*,
2019 WL 4893029 (S.D. Fla. Oct. 3, 2019) ..........................................................6

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ..........................................................................13

*In re Catalina Marketing Corp. Sec. Litig.*,
390 F. Supp. 2d 1110 (M.D. Fla. 2005)...............................................................14

*In re Coca-Cola Enters. Inc. Secs. Litig.*,
510 F.Supp.2d 1187 (N.D. Ga 2009) (Thrash, J.) ...............................................23

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..........................................................................................2, 24

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. GA. 2019) (Thrash, J.) .....................................15, 16

*FindWhat Investor Group v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ..........................................................................14

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. GA. Mar. 23, 2018) .............................................13, 22

*Garfield v. NDC Health Corp.*,
466 F.3d 1255, 1262 (11th Cir. 2006) ...................................................................6

*In re Hartman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015)...............................................................................15

*In re Health Ins. Innovations Sec. Litig.*,
 2019 WL 3940842 (M.D. Fla. June 28, 2019) ...................................................23

*Kinnett v. Strayer Educ., Inc.*,
 501 F. App'x 890 (11th Cir. 2012) ...................................................................25

*Luczak v. Nat'l Beverage Corp.*,
 812 F. App'x 915 (11th Cir. 2020) .......................................................6, 7, 8, 24

*Marrari v. Med. Staffing Network Holdings, Inc.*,
 395 F. Supp. 2d 1169 (S.D. Fla. 2005) ...............................................................9

*Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v.*
 *Welbilt, Inc*,
 2020 WL 905591 (M.D. Fla. Feb. 6, 2020).......................................................25

*Mizzaro v. Home Depot, Inc.*,
 544 F.3d 1230 (11th Cir. 2008) ...................................................................5, 19

*Mogensen v. Body Cent. Corp.*,
 15 F. Supp. 3d 1191 (M.D. Fla. 2014).............................................................19

*Neb. Inv. Council v. Fid. Nat'l Info. Servs., Inc.*,
 2024 WL 4349125 (M.D. Fla. Sept. 30, 2024)..................................................19

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
 367 F. Supp. 3d 16 (S.D.N.Y. 2019) ................................................................10

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ...................................................11

*Pub. Empl. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
 564 F. Supp. 3d 1272 (N.D. Ga. 2021)..............................................................10

*Ret. Sys. v. S. Co.*,
 333 F. Supp. 3d 1315 (N.D. Ga. 2018) .............................................................19

*Ret. Sys. v. Stryker Corp.*,
 2011 WL 2650717 (W.D. Mich. July 6, 2011)....................................................6

*Roofer's Pension Fund v. Papa*,
 2018 WL 3601229 (D.N.J. July 27, 2018) ........................................................12

*S.E.C. v. Adler*,
  137 F.3d 1325 (11th Cir. 1998) ............................................................................23

*S.E.C. v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ..............................................................................10

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002)...................................................................9

*S.E.C v. Merchant Capital, LLC*,
  483 F.3d 747 (11th Cir. 2007) .........................................................................13, 14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..................................................................................5, 16, 22

*In re Theragenics Corp. Sec. Litig.*,
  137 F. Supp. 2d 1339 (N.D. Ga. 2001) (Thrash, J.) ......................................10, 23

*Thomspon v. RelationServe Media, Inc.*,
  610 F.3d 628 (11th Cir. 2010) ..............................................................................25

*Tolbert v. Queens Coll.*,
  242 F.3d 58 (2d Cir. 2001) ...................................................................................14

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015)...............................................................15, 18

*Waterford Twp. Gen. Emps. Ret. Sys. v. Suntrust Banks, Inc.*,
  2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) .....................................................25

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023)............................................................21, 22

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A)......................................................................................15

PSLRA ...............................................................................................................13, 15

**INTRODUCTION**

Defendants' Motion to Dismiss All Claims in the Second Amended Complaint (Dkt No. 56) ("Defs.' Br.") offers no basis for dismissal. Where required, Plaintiff meets the pleading requirements of the PSLRA and Rule 9(b) by demonstrating Defendants' fraudulent scheme with detailed facts – identifying their false and misleading statements and demonstrating those statements were made knowing they were misleading to the investing community. Likewise, the Second Amended Complaint ("SAC") (Dkt. No. 53) easily satisfies Rule 8(a) for pleading loss causation.

The crux of Defendants' liability is that they repeatedly and specifically attributed Fox Factory Holding Corp.'s ("FF") revenue growth (and supported their projection of $1 billion in "organic" growth) throughout the Class Period[1] to "increased customer demand" without disclosing that (1) FF's revenue growth was due to the fulfilment of past orders made during Covid when demand was high; and (2) demand was in fact deteriorating sharply. This Court and others around the country have repeatedly held such a knowing "misattribution" of reported revenue is a material misstatement sufficient to state a claim for a violation of the Exchange Act and Rule 10-b(5).

Defendants' motion raises every argument they can muster, but their kitchen-sink approach belies the weakness of their arguments. First, as permitted by the Court, Plaintiff has corrected his complaint to specifically state the factual basis

---

[1] The Class Period runs from May 6, 2021 to February 22, 2024.

demonstrating why each actionable statement and omission was false and misleading. Defendants contend that the SAC fails in this regard because the SAC does not separate each statement – one by one – to state why it is false. But Defendants fail to cite a single case requiring such repetition – in fact, they cite no case at all. The Court did not require it.

Second, the SAC sets out with specificity each of the material misstatements and the reasons why they are false. Defendants' response is to simply call these allegations "conclusory," or claim that "many," of them are "puffery," "opinion," or protected by the PSLRA "safe-harbor." But Defendants improperly list numerous paragraphs of the SAC where Defendant contends such arguments prevail and refuses to identify the actual statements. In truth, the statements identified by Plaintiff were material to investors – analysts repeatedly inquired specifically about demand and inventory – and these statements are grounded in present or historical fact, *i.e.* not "forward-looking."

Third, Defendants' contention that Plaintiff fails to plead a strong inference of scienter applies the incorrect legal standard and simply ignores the specific allegations of the SAC. The "holistic" scienter analysis required by *Tellabs* is nowhere to be seen. And Defendants ignore allegations of contemporaneous information they knew – ***and admitted they knew*** – that contradicted their public statements at the time they were made.

Last, the SAC's allegations easily satisfy Rule 8(a) and "provide defendants with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Defendants'

2

Motion to Dismiss the SAC should be denied.

**STATEMENT OF RELEVANT FACTS**

FF's Specialty Sports Group ("SSG") and Power Vehicle Group ("PVG") engineer, manufacture and market high-performance suspension products for bikes (SSG) and off-road and other specialty vehicles (PVG). Demand for bicycles exploded during the 2020 pandemic year due to a surge in popularity of outdoor activities. ¶31.[2] As bike inventories quickly sold out, bike OEMs, which accounted for 75-80% of SSG's revenue, began ordering significantly more product than usual from FF and other parts manufacturers to meet the increase in consumer demand and navigate supply chain shortages. ¶32.

This outsized demand quickly evaporated, however, and from March through September of 2021, OEMs began canceling the large orders they had placed with bike fabricators and approaching FF and other suppliers about delaying shipments of the components they had ordered. This left FF holding substantial purchase orders for bike shocks, forks and suspensions that the OEMs no longer needed. To maintain its relationships with the OEMs, FF agreed to delay delivery of these orders rather than have them cancelled and to warehouse any completed parts until they were needed by the OEMs. ¶¶33-35. As a result, beginning in Q1 2021, FF's inventories of raw materials and completed parts began to rise significantly from $127 million in Q4 2020 to a high of $379.8 million in Q1 2023. *Id.*

---

[2] All cites to ¶__ are to the SAC; and unless otherwise noted, all emphasis is added and internal citations are omitted.

3

FF's agreements with OEMs in 2021 to delay fulfillment of existing orders due to plummeting demand for bikes, and the lower demand itself, invariably led to lower OEM demand in 2022 and 2023 as products shipped in 2021 and 2022 were largely the fulfillment of earlier delayed orders. A former senior manager of demand planning and forecasting who worked at FF from July 2018 to November 2023 ("FE 1") estimated that in 2022, OEM demand declined by 40% and that demand from Specialized Bicycle Components ("Specialized"), one of FF's largest OEM customers, fell an estimated 60%. ¶¶37-41.

This same pattern played out with SSG's aftermarket bike customers as well. In 2021, dealers and distributors who had over-ordered to meet the pandemic-fueled demand of 2020 also began canceling or reducing orders with FF and aftermarket inventory began to build. Indeed, by the summer of 2022, there was so little demand and so much product had arrived at FF's Reno and Vancouver warehouses from FF's Taiwan manufacturing facility that additional offsite storage locations had to be rented. ¶¶43-44; 47-49.

PVG was affected by the same market conditions as SSG. By 2022, the surge in demand from COVID was over, PVG had lost two large OEM customers, Jeep and Polaris, and rising inventories required more rented warehouse space. ¶¶52-58; 64. Nevertheless, due to SSG's abysmal performance, in late 2021 PVG's Aftermarket Applications Group (AAG) was tasked with making up an estimated shortfall of $100 million in the forecast for 2022. ¶58. During this time, as Humphrey was told, PVG was inflating its reported revenue by shipping aftermarket orders at

quarter-end before the agreed-upon shipping date only to have them returned by the customers. ¶¶60-62; 65-67.

The truth was revealed on November 2, 2023 and February 22, 2024. on November 2, when FF reported a 58.6% decline in SSG sales for 3Q-2023, citing "inventory destocking," causing FF shares to plummet 37.34%. ¶¶130, 133-34. Then, on February 22, FF reported a 52.7% decline in SSG sales for 4Q-2023 due to "channel inventory recalibration" and "lower end consumer demand," along with a 10.7% decline in PVG sales due to "elevated inventory levels" and customers "delaying sales," causing FF shares to drop by nearly 27%. ¶¶135, 138-39, 143.

## LEGAL STANDARD

On a motion to dismiss, the Court must consider the complaint in its entirety, accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint may survive a motion to dismiss "even if it is 'improbable' that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely 'remote and unlikely.'" March 14, 2025 Op. ("Op."), at 5 (ECF No. 49). To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) loss causation. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008).

5

## ARGUMENT

## I.    THE SAC REMEDIES THE FAC'S DEFECT

The Court dismissed the FAC because it failed to properly allege why each of the alleged false and misleading statements were so. Op. at 12. The SAC remedied that defect in two ways. First, it separates the various statements by topic, such as statements regarding "increasing demand," statements regarding inventory, risk disclosure statements, and the promised $2 billion in revenues. Second, it specifically states why each of those statements was false and misleading, citing specific facts. The SAC is therefore unlike the complaint in *Cambridge Ret. Sys. v. MEDNAX, Inc.*, 2019 WL 4893029 (S.D. Fla. Oct. 3, 2019), in that it does not "simply repeat the same litany of boilerplate allegations after each of Defendants' statements." The SAC more than satisfies the PSLRA's requirements. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 2011 WL 2650717, at *7 (W.D. Mich. July 6, 2011) (the "use of a single set of reasons to explain why various statements are false" is an "acceptable means of identifying the reasons for falsity").

## II.    THE SAC PLEADS ACTIONABLE STATEMENTS UNDER § 10(b)

To comply with the Rule 9(b), a securities plaintiff must specify the time, place, and content of the alleged misstatements, i.e., "the who, what, when[,] where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006). "Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 923 (11th Cir.

6

2020). "A statement is misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it." *Id.*

### A. The Statements Concerning SSG and PVG Demand Were Materially False and Misleading

Throughout the CP, Defendants consistently and falsely characterized existing and projected demand for SSG and PVG products in both the OEM and aftermarkets as "strong," "high," "robust," "very strong," "incredibly strong," "staggering" and "unprecedented." Defendants also repeatedly assured investors that there were "no signs" that the demand created by the pandemic was "abating," being "overestimated," or "slacking off at all in any of FF's product lines." ¶¶78-79, 93. Indeed, Defendants went so far as to suggest that "the tectonic shift created in consumer demand" by the pandemic might be permanent, stating that it "seemed more than just a transitory bubble." ¶8, 73.

Importantly, Defendants repeatedly attributed FF's revenue growth each quarter to *increased* demand for FF's products, suggesting that demand for FF's products was growing, or at a level higher compared to some previous point in time. For the SSG side of the business, Defendants repeatedly claimed the increasing revenues were attributable to "*increased* demand," ¶¶72, 77, 81, 85, 87, 91, 95, 96, and "*continued* strong demand," ¶¶91, 98, noting that "demand *[was] up* significantly year-on-year over 100%." ¶98. The same was true for the PVG side of the business. *See*, *e.g.*, ¶119 (attributing increase in PVG sales to "increased demand" in the [OEM] channel over repeated quarters).

7

Each and every one of these statements was false and misleading, because they gave the false impression that the company was growing "organically" when, in fact, the demand "growth" had ended and the increased revenues were the result of filling old orders and pulling forward sales to increase revenues. As detailed in highly corroborative accounts from multiple former employees of FF (FE 1 - FE 5), FF's former VP of Supply Chain, and from the COO of Specialized, SSG's largest OEM customer ("Customer COO"), by the start of the CP, the pandemic era explosion in demand was over. The Customer COO explained that demand for bikes had begun to moderate by May 2021 and had fallen back to pre-pandemic (2019) levels by October 2021, which caused OEMs, including Specialized, to cancel or delay orders for parts that they had placed with FF and other suppliers, leaving the suppliers holding large inventories of raw materials and finished goods. ¶¶33-34. This account was corroborated by FE 1, a manager of demand planning and forecasting at FF who reported to VP of Supply Chain, Mark Garcia. FE 1 stated that "a lot" of SSG's OEM customers approached FF in the first half of 2021 about delaying shipments of parts they had ordered, noting that OEMs Giant, Scotts, and Specialized all pushed out their orders due to declining demand. ¶40. FE 1 recalled that these requests to delay orders ultimately led to outright cancellations by late 2021 and 2022. *Id.* FE 2, a Customer Service/Call Center Manager for SSG's aftermarket division, recalled that distributor demand for aftermarket products was also declining, noting that Quality Bicycle Products, the largest bike distributor in the U.S., had canceled a multi-million-dollar order with FF in the first half of 2021. ¶47. Both FE 1 and FE 2 recalled that FF's Reno warehouse, which housed

8

aftermarket products, was overflowing with excess inventory by mid-2022 due to distributor cancellations and disappearing demand. ¶¶43-44, 46, 48. FE 3, VP of Sales for PVG's aftermarket segment who oversaw a group of approximately 50 salespeople, recalled that sales began to slow by the second half of 2021 because dealerships were still waiting for delivery of backlogged orders from 2020, and that by mid-2022, the decline in sales was "dramatic" as dealers no longer wanted more inventory. ¶¶53, 55. FE 3 also recalled that PVG was tasked with making up a forecast shortfall of approximately $100 million resulting from SSG's poor sales performance. ¶58. FE 4 and FE 5, cost accountants at PVG's Gainesville facility, recalled that multiple warehouses were filled with excess PVG inventory, including obsolete inventory, ¶¶64, 67, and that FF was pulling forward sales to conceal declining PVG demand, a practice that FE 4 discussed with Humphrey. ¶¶60, 62, 65.

The foregoing allegations directly contradicting the alleged misstatements detailed above are more than sufficient to allege falsity. *See Marrari v. Med. Staffing Network Holdings, Inc*., 395 F. Supp. 2d 1169, 1185-87 (S.D. Fla. 2005) (statements that demand "remains robust" and "record results" reflected "significant growth" actionable where "demand was falling" and new offices were underperforming); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1363-64 (N.D. Ga. 2002) (statements that demand was accelerating were false and misleading in light of allegations from former employees that there was decreased spending by customers).

Defendants contend that their misleading statements concerning "demand" for its SSG and PVG products are not actionable because Plaintiff does not challenge the company's reported earnings, and Defendants' use of "demand" includes

9

fulfilling backlog orders. Defs.' Br. at 11. Defendants are wrong.  First, nothing in the SAC suggests that Defendants considered backlogged orders as part of current demand. On the contrary, ***Defendants themselves did not refer to "backlog" and "demand" as the same thing when speaking to investors.*** *See*, *e.g.* ¶119 (stating that they "anticipated the PVG group will continue to grow at the current rates given the significant backlog . . . along with strong demand").[3] Second, if backlogged orders were part of current demand, Defendants were still required to disclose the role of backlog in their "demand" statements in order to make those statements not misleading to investors, since the filling of "backlog" orders does ***not*** indicate future growth in the same way "increasing demand" does. *See In re Theragenics Corp. Sec. Litig.*, 137 F. Supp. 2d 1339, 1349 (N.D. Ga. 2001) (Thrash, J.) (statements failing to disclose that increased demand was temporary because it was due to shortage of competitor's product actionable); *Pub. Empl. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1292 (N.D. Ga. 2021) (statements attributing record margins to high sales volume actionable because Defendants failed to disclose that record margins were achieved through overproduction of goods).[4]

---

[3] Defendants cite to ¶89, Defs.' Br. at 11, but the full statement, that a "record backlog for us, it kind of reinforces that demand is incredibly strong," further supports that Defendants did not consider demand the same thing as backlog.

[4] *See also*, *e.g.*, *S.E.C. v. Todd*, 642 F.3d 1207, 1222 (9th Cir. 2011) (statements attributing growth to core business performance rather than one-time transactions actionable even though revenue was accurately reported because they misled investors about source and sustainability of growth); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) (statements attributing revenue growth to "robust," "good," or "strong" end-user demand were

**B.    The Statements Concerning Inventory Were Materially False and Misleading**

As a result of declining demand and customers delaying and cancelling orders, FF's inventory began increasing dramatically. ¶¶34-35. But Defendants could not admit the true reason for the spike in inventory (flagging demand) or it would prove the lie of their statements regarding the source of their increasing revenues.  So while they reported their inventory numbers at the end of each quarter, when asked about it by analysts, Defendants ascribed a reason for the increasing numbers that was consistent with their "increasing demand" statements – rendering those statements false and misleading as well. *See* ¶¶100-108 (attributing the Company's inventory buildup to "natural growth to meet anticipated demand," and "additional raw materials purchases to mitigate risks associated with supply chain uncertainty.").

Defendants' inventory statements were false and misleading because, as multiple FEs with firsthand knowledge confirmed in highly corroborative accounts, the buildup of inventory was due to undisclosed decreased demand, customer cancellations, and requests to delay the fulfilment of orders. *See* ¶¶39-40, 43-44, 48, 63-64. And the cause of inventory buildup was material to investors. *See*, *e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *8 (S.D.N.Y. Apr. 14, 2020) ("Plaintiff has adequately alleged that Defendant's sales

---

actionable because "a reasonable investor would likely have found it significant that printer supplies revenues were driven by inflated channel inventory and not increased end-user demand because those forces fundamentally differ in sustainability.").

11

practices created a trend of increasing inventory and that Defendants should have disclosed this trend.").[5]

### C.     The Revenue Guidance Was Materially False and Misleading

Throughout the Class Period ("CP"), Defendants repeatedly promised the market that the Company was "tracking" to $2 billion in revenues in 2025, including "organic" revenue growth of $1 billion, even as new demand dried up and it became obvious to Defendants that such numbers were simply impossible. ¶¶110-11, 113, 114-15, 133. Because the backlog at its CP peak was $220 million at year end 2021 and was in decline throughout the CP as customers cancelled orders, the only way FF could grow organic revenue by $1 billion was through increasing sales, which Defendants knew were declining sharply due to a lack of new demand. Defendants' growth projection statements were false and misleading because they failed to disclose key information seriously undermining those projections. *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018) (statements touting company's "ability to keep delivering" certain organic growth rate were false and misleading because defendant failed to disclose that company was currently experiencing difficulty maintaining growth).

---

[5] Contrary to Defendants' contention, *see* Defs.' Br. at 9, the inventory buildup was caused not just by a significant number of cancellations, as reported by multiple FEs, but by numerous customers delaying shipments. *See supra* at II.A. And the allegations connecting the massive buildup of PVG inventory to a sharp drop in demand (and the loss of two more customers) are credibly derived from FEs' with firsthand knowledge. ¶¶64, 67.

**D.      The "Risk Disclosures" Were Materially False and Misleading**

Throughout the nearly 3-year CP, Defendants' SEC filings contained the same identical risk disclosures: that the company *could* "fail to achieve future growth or [FF]'s sales *could* decrease," and that FF *could* be "unable to sustain its past growth rate or successfully implement [its] growth strategy." ¶¶ 121-29. These disclosures were false and misleading because they described risks to the company's business as purely hypothetical when in fact the risks were already present. *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007). Moreover, these disclosures never changed during the CP so were not "specifically tailored" to the existing risks. *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *11 (M.D. GA. Mar. 23, 2018). Defendants' only argument is to summarily claim "this assertion is not supported by any particularized facts." Defs.' Br. at 15. Not so. Plaintiff has alleged the necessary facts to satisfy Rule 9(b), including the reasons why the statements were false. *See* ¶¶31-68.

**E.      Defendants' False and Misleading Statements Are Not Protected by the PSLRA Safe Harbor, Opinion, or "Puffery"**

Defendants challenge four of the alleged misstatements in the AC as "forward-looking" and protected by the PSLRA's safe harbor. Defs.' Br. at 12. None of the identified statements regarding Defendants' revenue projections are entitled to safe harbor because they misrepresented what was happening in the present, or had recently occurred. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, (11th Cir.

13

2019).[6] But the truth was that Defendants knew the present (and recent past) results **undermined** the $2 billion revenue projection, rendering these statements unprotected and actionable.[7] *See FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011); *In re Catalina Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1116 (M.D. Fla. 2005) (statements that defendants' rapid growth would continue not subject to safe harbor where defendants had access to internal data that belied those statements).[8] Although Defendants also claim that "some" statements are opinion, they fail to identify any specific statements, nor do they provide any analysis. Defendants' opinion arguments are waived. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).

Nor are any of four statements Defendants identify in their brief "inactionable puffery." Defs.' Br. at 13-14.[9] In the body of their motion, Defendants identify only

---

[6] *See, e.g.* ¶110 ("**We're on track** [to achieve $2 billion in revenue]"); ¶113 ("**And in the last quarter, we saw the right signs of improvement and progress that give us even more confidence to those commitments**"); ¶115 ("**results continue to give confidence** in long-term vision of $2 billion in revenue").

[7] As late as November 2023, even as FF reported a 58.6% *decrease* in SSG sales for Q3 2023 and cut guidance for FY 2023, Defendants continued to make the misleading claim that they expected to "achieve the 2025 target of $2 billion sales." ¶133. *Merchant Capital,* 483 F.3d at 769 (good faith projection "became, with experience, a materially misleading omission of material fact.").

[8] In a footnote, Defendants claim that statements in an additional 17 paragraphs in the SAC are subject to safe harbor. Because Defendants make no attempt to identify the statements themselves or set forth their position, any argument with respect to these statements is waived. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[9] Defendants claim that unspecified statements in 25 paragraphs in the SAC are also inactionable puffery, *see* Defs.' Br. at 13 n.3, but for the same reasons noted above, *see supra* n.5, Defendants have waived any puffery argument for these statements.

14

four partial quotes from the SAC. Defs.' Br. at 13-14. But context matters. And in the context of this case, the statements Defendants point to are not "obviously unimportant to a reasonable investor" because they all coincide with Defendants' assurances about "demand." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. GA. 2019) (Thrash, J.). Numerous courts have held that statements characterizing demand as "strong" are not immaterial because they provide "concrete information" about a company's performance. *See*, *e.g.*, *In re Hartman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109-10 (D.C. Cir. 2015) (statement that sales of aftermarket products were "very strong" was not puffery); *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 647-48 (E.D. Pa. 2015) (statements that results were "especially strong" and demand was "solid" and "good" when actual conditions were declining is not puffery).

## III.   THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER WITH PARTICULARITY

Contrary to Defendants' contention, the SAC adequately alleges a strong inference of scienter. A showing of "severe recklessness" satisfies the scienter requirement under the PSLRA. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir 1999). The SAC must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter, is defined as "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Bryant* at 1282 n. 18 (11th Cir. 1999). The court must consider the

15

complaint in its entirety, including inferences to be drawn from the allegations. *Tellabs*, 551 U.S. at 326 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

Defendants' motion fails to "assess all the allegations holistically" and looks upon each fact separately. *Id*. "Holistically," the SAC pleads a strong inference of scienter. As this Court has articulated, "circumstantial evidence can be sufficient to establish a strong inference of scienter. Since scienter is a highly fact-intensive inquiry, such questions are most appropriate for a fact finder. 'In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Equifax*, at 1232-1233. The answer is "Yes."

Plaintiff principally pleads scienter based on the following facts: (i) the accounts of six former employees across FF's business segments and the Customer COO that by the start of the CP, demand was cratering, substantial numbers of orders were being delayed and/or canceled, and FF's inventories were rising to such a degree that additional storage space had to be rented (¶¶33-68, 42); (ii) Defendants' own admissions (¶¶79, 81, 98, 163-167); (iii) availability of weekly reports reflecting slowing demand and rising inventories that were prepared by Sydney Wu, Humphrey's direct report (¶39); (iv) monthly meetings attended by SSG President Tutton (Dennison's direct report), and Wu, at which slowing demand and rising inventories were discussed (¶37); (v) Tutton approving requests for large cancelations (¶40); (vi) Humphrey's awareness of PVG's practice of pulling forward revenue at quarter ends (¶62); and (vii) Defendants' unusual and highly suspicious

16

stock sales and lucrative incentive compensation. The preceding demonstrate particularized facts that Defendants knew, or were severely reckless in not knowing, about decreasing demand and increasing inventory, and acted to conceal same.

**A.      Allegations of Former Employees Are Well-Pled and Support a Strong Inference of Scienter**

Plaintiffs rely on the statements of six former employees and a former customer to demonstrate that Defendants were aware of information, including "contemporaneous internal reports," that contradicted their public statements.  These allegations are detailed and comprise more than 35 paragraphs of the SAC. *See*, ¶¶31-68. The seven witnesses are appropriately identified and the statements they offer corroborate each other. In combination, they paint a compelling picture of Defendants' fraudulent scheme.[10] Defendants attack these witnesses by picking standalone facts, such as job title, to then argue that all FEs are too far removed from Defendants to support scienter. Defs.' Br. at 18-20. Defendants are wrong.

First, the SAC appropriately describes the FEs to justify the Court's reliance on their statements, including FE 1-5's titles, dates of employment, job duties involving first-hand knowledge of demand and inventory (such as interactions with customers regarding falling demand, observations of inventory and pulling ahead,

---

[10] Defendants' scienter argument is based on a fundamental misunderstanding: that "the central theory of Lead Plaintiff's complaint is that increasing inventory levels were being driven by undisclosed customer cancellations." Defs.' Br. at 16. Not so. The SAC is chock-full of detailed factual allegations showing that Defendants had access to information and internal reports demonstrating they knew ***demand*** was in decline and revenue "growth" was only possible due to a large backlog of orders. Defendants' failure to address ***these allegations*** is fatal to their motion.

17

access to data showing inventory and demand statistics), and direct supervisors (including direct reports of Dennison and Humphrey). ¶¶36-68. *See Mizzarro* at 1240 (if complaint "fully describes the foundation or basis of CW's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame," "confidentiality should not eviscerate the weight given.").

Circumstantial evidence that FF continuously tracked its demand, sales, cancellations, and inventory via meetings, internal reports, and a database indicates that Defendants were aware or were severely reckless in not being aware of the declining demand negatively impacting FF's business. *See In re Urb.*, 103 F. Supp. 3d at 653-54 (databases accessible to employees showing declining sales trends created inference of scienter even without allegation that defendants accessed said database). Witnesses offer detailed facts demonstrating myriad ways Defendants had access to information that demand had dramatically fallen, and inventory had spiked. *See*, *e.g.* ¶¶37, 56 (monthly meetings about slowing demand, declining sales, sales forecasts, and inventory with high level managers, including Tutton); ¶¶38 (weekly calls attended by directors and senior personnel regarding sales, ongoing cancellations, returns, and risks of cancellations); ¶40 (Tutton, who reported to Dennison, approving large order cancellations); ¶44 (Tutton aware of increasing inventories); ¶47 (Tutton in a meeting to discuss QBP order cancellation); ¶39 (Wu's team prepared and circulated reports on sales and inventory, including excess inventory, and inventory reports that went to Tutton); ¶51-52 (FE 3 repeatedly raised the backlog issue with Tom Fletcher, who reported to Dennison); ¶54 (CRM database that tracked daily sales data, accessible to Defendants); ¶56 (monthly

18

meetings attended by Fletcher where they discussed "what would happen to sales once the backlog ran out.").

Defendants contend none of this matters, because none of these confidential witnesses directly spoke with a named Defendant. Defs.' Br. at 17. But not only is direct communication not required, it is not supported in the law. "First-hand interactions with a defendant" are not a prerequisite for credible witness accounts. *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 333 F. Supp. 3d 1315, 1323 (N.D. Ga. 2018) (holding that *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191 (M.D. Fla. 2014) – cited by Defendants – does not stand for the proposition that scienter standard requires pleading of first-hand interactions between confidential witnesses and defendants). Confidential witnesses simply must be in positions that give them access to relevant knowledge. *Neb. Inv. Council v. Fid. Nat'l Info. Servs., Inc.*, 2024 WL 4349125, at *4 (M.D. Fla. Sept. 30, 2024).[11] Moreover, ***FE 4 did discuss FF's pulling forward of revenue with Humphrey.*** ¶62.

Defendants further argue that FE 4's conversation with Humphrey regarding pulling forward of PVG revenue was vague and did not connect to statements made by Humphrey. ¶¶19-20. On the contrary, the SAC describes in detail that while performing FE 4's duties, FE 4 saw when revenue was recognized and reversed, inventory increases, and the pulling forward of revenue at quarter ends. FE 4 brought this issue to Humphrey in January 2022, and Humphrey was concerned. ¶¶59-62.

---

[11] In fact, *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008), cited by Defendants, is not to the contrary, holding that "lack of direct evidence connecting the defendants to the alleged fraud is not fatal, because plaintiffs may create a 'strong inference' of scienter by circumstantial evidence alone." *Id.* at 1249.

19

Importantly, FE 4's recollection shows Humphrey's direct knowledge of the issue, which was omitted from FF's reports of large increases in PVG sales, including in 2022 and 2023 (after FE 4's conversation with Humphrey), including in 10-Qs that Humphrey signed. ¶119. Finally, FE 5 corroborated that FF was pulling forward revenue.[12] ¶¶65, 68. The FEs' statements support a strong inference that Defendants were aware of the demand issues during the CP, and were working to conceal it.

Defendants simply ignore that not only do these witness accounts corroborate each other, but *other* witnesses corroborate the FEs' information. For example, as described above, the former Customer COO stated that from March through September 2021, OEMs were cancelling and delaying orders. ¶¶33, 35. FF's former VP of Supply Chain – in an interview in May 2024 – stated that by Q2 2022 FF was "proactively approaching customers on its own to cancel what Fox believed were excessive orders." ¶42.

### B.    Defendants' Own Statements Corroborate the Witnesses and Admit Scienter

Defendants' own statements to analysts admitted they were keenly aware of the state of demand for their products at all times, thereby corroborating the FEs. Defendants intentionally offered their "inside knowledge" and "close" relationship

---

[12] Defendants argue that the pulling forward of revenue claim is not pled with particularity. This is incorrect. FE 4 and FE 5 describe how the revenue was pulled forward by shipping aftermarket orders before the contractual shipping date and conveniently just before quarter ends, which customers would ship right back (¶¶60-61, 65), that they approached higher ups about their concerns, including Humphrey and Dennison's direct report (¶¶62, 65, 67), and when this practice occurred (for most of FE 5's employment between July 2021 to April 2022, including in January 2022 when FE 4 approached Humphrey). (¶62).

with their customers to convince the market that they were going to reach the $2 billion goal. *See, e.g.* ¶79 (insight into distributors and OEM channels; overestimating demand "could not be a significant issue"); ¶81 ("we have a good view of demand throughout 2022 for both OEM and aftermarket orders"). These admissions **by themselves** "plausibly show that the individual defendants had access to and monitored data indicating [the Company's] decline in customer demand." *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023); ¶¶163-167.

For example, on November 4, 2021 on a conference call with analysts, Dennison repeatedly commented on demand, telling analysts that "demand across [FF's] product categories continue[d] to be strong with no signs of abating." ¶81. On the same call, he assured those same analysts that **Defendants kept "a finger on the pulse of demand, which continued to stay strong,"** *and* **"we have a good view of demand throughout 2022 for both OEM and aftermarket orders**." *Id.* Dennison made a similar claim in the conference call for Q1 2023, in which Defendant Torres participated. ¶¶98, 164.

Defendants also repeatedly explained to analysts that they had a clear view of the state of demand because of their close relationship with their customers. For example, during the February 24, 2022 conference call Dennison assured investors they had "**very strong, solid communication with our customers**." ¶166. And in August 2023, Dennison assured analysts they were "**getting pretty good feedback from all our major customers**," noting that "**[w]e have a couple that are very transparent with us and giving us a lot of insight as to what they're seeing in trends and markets and things like that.**" *Id.*

21

These assurances on public conference calls – assuming they are not false – constitute admissions by Defendants that not only did they have the ***ability*** to monitor demand at FF but that they did, in fact, do so throughout the CP. Granting all inferences in favor of Plaintiff, these admissions establish scienter.[13] *See*, *e.g.*, *Flowers*, 2018 WL 1558558, at \*14 ("court can reasonably conclude that defendant necessarily is provided significant information, formally and informally, about the financial performance, or failure of performance, over which he has overall operational responsibility."

### C.    Defendants Profited Handsomely from Their Fraud

Through CP stock sales and incentive compensation, Defendants profited handsomely from their fraud. "Personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 310. Improperly viewing the allegations in isolation rather than holistically, *see id.* at 326, Defendants argue that their sales of FF shares do not give rise to a strong inference of scienter. Defs.' Br. at 20-21.

Insider sales will support a strong inference of scienter when they are suspicious in timing or amount. *See S.E.C. v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998), *see also, In re Theragenics*, 137 F. Supp. 2d at 1361. Here they were both. Courts look to (1) the percentage or amount of shares sold, (2) the timing of the sales, and (3) how those sales compare to pre-CP transactions by the same defendant. *In re Theragenics*, 137 F. Supp. 2d at 1361. Dennison and Humphrey, and SVP Tutton,

---

[13] These admissions also undermine Defendants' contention that the information provided by FEs, and available on the Company CRM database, is too "generic" to infer Defendants were aware of it.  *See*, *e.g.* Defs.' Br. at 16-19.

sold sizable percentages of their holdings, at times that maximized their profits, and in amounts that were inconsistent with their pre-CP sales.[14]

All of these sales are sufficiently suspicious in timing and amount to support a strong inference of scienter. *See*, *e.g.*, *In re Health Ins. Innovations Sec. Litig.*, 2019 WL 3940842, at *25–26 (M.D. Fla. June 28, 2019) (stock sales during the CP were "unusual" and "suspicious" where defendant made three sales, two of which represented between 10-20% of his holdings). Along with incentive compensation, Defendants' financial motivation to engage in fraud is even stronger.[15]

Further, an "extraordinary incentive package may motivate a corporate officer to engage in fraudulent activity." *In re AFC Enters., Inc. Secs. Litig.*, 348 F.Supp.2d 1363, 1374 (N.D. Ga. 2004) (Thrash, J.). In this case, Defendants' incentive package

---

[14] Dennison made five CP sales at an average price of $125.76 per share, totaling $4.3 million. The opportunistic sales were at an average of more than 2.6 times the price of FF's stock at the end of the CP. He sold approximately 32.5% of his total shares, and all of the sales occurred before the first corrective disclosure. By contrast, Dennison made only two sales during the 32 months prior to the CP, receiving $1.25 million. ¶¶146-147. Humphrey did not sell any shares before or after the CP. But during the CP, he made two sales totaling more than 12% of the stock he owned, and profiting $286,494. ¶¶148-151. Tutton sold 64% of his holdings during the CP, totaling approximately $2 million in profit. Tutton made almost twice as much in stock sales during the CP than in the 34 months before the CP began. ¶¶152-153.

[15] Defendants' reliance on *In re Coca-Cola Enters. Inc. Secs. Litig.*, 510 F. Supp. 2d 1187 (N.D. Ga 2009) (Thrash, J.) is misplaced. There, the court rejected motive allegations because (1) defendants' two CEOs did not sell any shares during the CP; and (2) the officers in question "either increased or retained their level of ownership" during the CP. *Id* at 1202. But here, Defendants engaged in an unusual stock selloff, and Dennison, Humphrey, and Tutton reduced their ownership substantially.

changed dramatically at the beginning of the CP, effectively doubling (or more) Defendants' income if they hit certain performance metrics. *See* ¶¶154-162.

Defendants' "incentive compensation" took the form of "PSUs" – a restricted stock unit. ¶155. These PSU awards allowed Defendants and Tutton to obtain huge compensation increases compared to pre-CP compensation. *See* ¶157 (Chart). The incentive-based compensation, when viewed holistically as per *Tellabs*, created a significant financial motive for Defendants to make material misstatements.

## IV.   The SAC Adequately Pleads Loss Causation

Defendants incorrectly argue that the truth revealed was not the same as the misrepresentations that Plaintiff alleges. ¶24. To adequately plead loss causation, the allegations must satisfy Rule 8(a) and "provide defendants with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.*, 544 U.S. at 347. "Although a disclosure 'need not precisely mirror the earlier misrepresentation' in order to have a corrective effect, it must at least relate back to the misrepresentation and not to some other negative information about the company." *Luczak* at 921. Defendants misrepresented the demand for SSG and PVG products, claiming that demand was high when it was declining. FF's stock price declined when the omitted drop in sales and demand was finally disclosed on November 2, 2023 and February 22, 2024. ¶¶130-144, 168-172. Defendants further argue that there are other competing disclosures that may have caused the decline in share price. Defs.' Br. at 25. Plaintiff is not required to show that Defendants' act was the sole and exclusive cause of the injury suffered, just that it was a "substantial" or "significant contributing cause." *Kinnett v. Strayer Educ., Inc.*, 501 F. App'x 890,

24

892 (11th Cir. 2012).[16] There is nothing in the SAC that suggests that Defendants' proposed disclosures would (or did) affect the price of the stock. Defendants also offer no evidence that suggests the entire market corrected on the same days here (it did not).[17] The SAC alleges that throughout the CP Defendants misrepresented to the market declining demand. A decrease in sales and demand was disclosed on the dates alleged that caused a dramatic decline in FF's stock price. Loss causation is adequately pled.

## V.    The SAC Adequately Pleads a 20(a) Claim

The 20(a) claim survives as Plaintiff alleged a valid 10(b) claim and supporting facts.[18]

## **CONCLUSION**

For all the foregoing reasons, Defendants' motion should be denied.


Respectfully submitted,

---

[16] Plaintiff is not required to disaggregate other potential causes for the drop in stock price on the date of the corrective disclosure. *See Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc*, 2020 WL 905591, at *7 (M.D. Fla. Feb. 6, 2020).

[17] *Patel* and *Waterford* are distinguishable from this case as the alleged corrective disclosures in each case occurred in close proximity to other large-scale events that "wrecked havoc on the banking industry as a whole" (*see Patel* at 381) and a banking crisis (*see Waterford Twp. Gen. Emps. Ret. Sys. v. Suntrust Banks, Inc.*, 2010 WL 3368922, at *5 (N.D. Ga. Aug. 19, 2010). No such event is alleged here.

[18] *See*, *e.g.* ¶¶20-25, 69-70; *Thomspon v. RelationServe Media, Inc.,* 610 F.3d 628, 635-36 (11th Cir. 2010).

25

DATED: July 14, 2025

**EVANGELISTA WORLEY, LLC**

 *s*/ James Evangelista
James Evangelista (GA Bar No. 707807)

10 Glenlake Parkway
South Tower Suite 130
Atlanta, GA 30328
Telephone: 404-596-7334

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Thomas L. Laughlin, IV (*pro hac vice*)
Susan Hu (*pro hac vice*)
Karolina Klyuchnikova (*pro hac vice*)

The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile: 212-233-6334
tlaughlin@scott-scott.com
shu@scott-scott.com
kklyuchnikova@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall (*pro hac vice*)
Andrew Brown (*pro hac vice*)

2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 310-388-0192
brian@schallfirm.com
andrew@schallfirm.com

*Co-Lead Counsel for Plaintiff Ryan Marselis
and the Class*

26

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Opposition to Motion to Dismiss was served on July 14, 2025, by filing it using the Court's CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ James M. Evangelista*
James M. Evangelista
Georgia Bar No. 707807

*Co-Lead Counsel for Plaintiff Ryan Marselis and the Class*

## <u>LOCAL RULE 7.1(D) CERTIFICATION</u>

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Respectfully submitted this 14th day of July, 2025.

> */s/ James M. Evangelista*
> James M. Evangelista
> Georgia Bar No. 707807
>
> *Co-Lead Counsel for Plaintiff Ryan Marselis and the Class*